**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MAAMEAMBA ARTHUR-PRICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 3475** |
| | ) | |
| **ANTONY BLINKEN, United States** | ) | |
| **Secretary of State,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

MATTHEW F. KENNELLY, District Judge:

Maameamba Arthur-Price applied for a passport and was denied on the ground that she is not a U.S. citizen. Arthur-Price has sued for a declaration of her U.S. citizenship, claiming she was born in Oakland, California in January 1980. That is, in fact, what Arthur-Price was told and believes. The government contends that Arthur-Price was born overseas and opposes her claim in this case.

Arthur-Price's parents, Mrs. Mary Arthur and Rev. Kobena Korang Arthur, who were born in Ghana and are naturalized U.S. citizens, both say that Arthur-Price was, indeed, born in this country. The problem—and really, the reason for this lawsuit—is that they have told a different story in the past. This case is a good illustration of the aphorism, "Oh what a tangled web we weave / When first we practice to deceive!"[1] Arthur-Price's parents—particularly her father—have put her in a very difficult spot: they

---

[1] The quote is from Sir Walter Scott's *Marmion*.

have  effectively left her, if the government is right, as a person without a country (as the government's counsel pointed out during closing argument).  The Court finds, however, that despite her parents' unfortunate misstatements, Arthur-Price has established by a preponderance of the evidence that she was, in fact, born in the United States.

Arthur-Price's lawsuit originally included several claims, but the Court previously dismissed all of them except her claim under the Immigration and Nationality Act (INA).  *See Arthur-Price v. Blinken*, No. 21 C 3475, 2022 WL 1004415 (N.D. Ill. Apr. 4, 2022). Under 8 U.S.C. § 1503(a), "any person who is within the United States" that "claims a right or privilege as a national of the United States and is denied . . . upon the ground that he is not a national of the United States" may sue in district court "for a judgment declaring him to be a national of the United States."  8 U.S.C. § 1503(a).  As indicated, Arthur-Price seeks a declaratory judgment that she is a U.S. citizen.

The Court conducted a bench trial on May 31–June 1, 2023.  This decision constitutes the Court's findings of fact and conclusions of law.

## Facts

The only issue at trial was whether Arthur-Price was born in Oakland, California as she contends.  Arthur-Price, of course, has no firsthand knowledge of where she was born.  To support her claim, she offered the testimony of her parents, Mrs. Mary Arthur and Rev. Kobena Korang Arthur, and two of Mrs. Arthur's friends, Norma Armstrong and Dr. Stephen Safo Sampah, who say they met Mrs. Arthur in California around the time she gave birth to Arthur-Price in California.  A third friend, Nancy Eady, wrote a letter signed under penalty of perjury supporting Arthur-Price's claim but passed away before she could testify at trial.  The sworn letter was admitted in evidence without objection.

The government offered testimony from two witnesses, Joseph Kolb, Jr. and Matthew Knolle. Kolb is a U.S. Customs and Border Protection officer who testified regarding immigration policies and procedures at ports of entry. Knolle is a State Department special agent who investigated Arthur-Price's passport application.

The Court finds the facts as follows, having made judgments regarding the credibility of the witnesses and the weight to be given their testimony.

## A.    Mrs. Arthur's first entry into the United States

Rev. and Mrs. Arthur were both born in Ghana in the mid-1950s. Rev. Arthur holds several degrees, including two doctorates, and he served in the U.S. Navy as a chaplain for twenty-four years. Rev. and Mrs. Arthur are both naturalized U.S. citizens. They were married in Ghana about 40 years ago and have four children. The oldest was born at home in Ghana. The younger two were born in a hospital in Texas. Arthur-Price is the second oldest, born on January 12, 1980. The parties dispute whether Arthur-Price was born in Ghana or the United States.

Rev. and Mrs. Arthur testified that Mrs. Arthur's step-brother, Paul Dwumfoh, arranged for her to travel with him to the United States in 1979. Rev. Arthur testified that he did not come with them. Mrs. Arthur did not remember when during 1979 she entered the United States, but she did recall flying from Accra, Ghana to Oakland, California. She stated that she did not have any documentation in her own possession, such as a passport, visa, or birth certificate. She stated that she does not know how she was able to enter the United States; she testified that her brother handled all the arrangements for her. Rev. Arthur testified that in traditional Ghanaian culture, there is deference to elders and of women to men. Mrs. Arthur testified that, given this cultural

norm, she felt obligated as a younger sister to defer to her older brother's decision to come to the United States. She also testified that under the cultural practice in Ghana at the time, Rev. Arthur would also be expected to defer to her brother because her brother was older than him. Rev. Arthur similarly testified that he deferred to Dwumfoh's decision and that Dwumfoh took care of all the arrangements for Mrs. Arthur to travel to Oakland. Dwumfoh is now deceased. Mrs. Arthur testified that Dwumfoh had documentation showing their entry in 1979, but she did not see it. The record does not contain any documentation of her 1979 entry.

CBP officer Kolb testified that every adult must present a valid passport to an immigration officer when arriving at a port of entry. If the person is entering the United States as a non-immigrant, the officer will also review the person's visa. If the documentation is proper, the person receives a Form I-94 and a stamp in the passport. But Kolb acknowledged that mistakes can be made and that there are multiple ways to evade this requirement. He also testified that security measures and inspection standards in the United States were not as strict in the 1970s and 80s as they are today. He did not have any information about Mrs. Arthur's arrival to the United States. The Court notes that Kolb's testimony does not rule out the possibility that Dwumfoh was carrying, and presented, Mrs. Arthur's entry documentation.

Mrs. Arthur testified that at the time she travelled to the United States, she did not know she was pregnant. She learned this sometime shortly after arriving. She testified that she was living with her brother and her brother's friend, Emmanuel Essell, in Oakland, California. Essell is also now deceased. In a sworn affidavit admitted into evidence without objection, Essell stated that he "used to go visit Paul's place often"

4

and that Dwumfoh "was living with his sister, Mary Arthur."  Def.'s Ex. A at 82.  This suggests that Essell was not living with Dwomfoh as Mrs. Arthur had stated, at least not full-time.  Essell's affidavit does, however, corroborate that he saw Mrs. Arthur pregnant in Oakland in 1979.  Dr. Sampah, who testified at the bench trial, stated that he met Essell and Mrs. Arthur through a mutual friend at a Thanksgiving party in 1979.  Dr. Sampah testified that he thought Mrs. Arthur was pregnant and living with Essell at the time.

While in Oakland, Mrs. Arthur testified, she attended First African Methodist Episcopal (AME) Church.  Through the church, Mrs. Arthur met Nancy Eady and Norman Armstrong, who became her friends.  Mrs. Arthur testified that they assisted her during her pregnancy.  In a sworn letter admitted into evidence without objection, Eady corroborated this, stating that she knew Mrs. Arthur while she was pregnant.  Armstrong also provided corroboration, testifying at the bench trial that she and Eady helped Mrs. Arthur with her pregnancy.  Mrs. Arthur also testified that church members organized a baby shower for her before she gave birth.  Armstrong corroborated that there was a baby shower, though her recollection was that it happened after Mrs. Arthur gave birth.

## B.    Arthur-Price's birth

Mrs. Arthur testified that she gave birth to Arthur-Price on January 12, 1980 at home in Oakland.  Rev. and Mrs. Arthur both testified that Mrs. Arthur learned about home birth from her mother, who had been a midwife.  Rev. Arthur also testified that home births were very common in Ghana at the time.  Mrs. Arthur testified that

Dwumfoh and Essell[2] were also at the house at the time of the birth, but in another room.  After Mrs. Arthur delivered Arthur-Price, Essell told her that his friend, Maxine Johnson (now deceased), was a retired nurse, and he brought Johnson to help. Armstrong and Dr. Sampah both testified that although they were not present at Arthur-Price's birth, they learned afterward that Mrs. Arthur had given birth.  Mrs. Arthur testified that she did receive medical care for Arthur-Price after her birth at Saint Vincent clinic in Oakland, but there are no currently existing medical records.  A letter from the Children's Hospital in Oakland, which was admitted into evidence without objection, stated that the Hospital had destroyed "all records for the time period" of Arthur-Price's birth "in accordance with state and hospital document retention policies."  Def.'s Ex. A at 87.

Mrs. Arthur did not inform the Ghanaian embassy of Arthur-Price's birth, nor did she register the birth in the United States.  Although Rev. and Mrs. Arthur testified to learning about U.S. birthright citizenship at different times, they both testified that at the time of Arthur-Price's birth, they were unaware that she was a U.S. citizen by virtue of her birth in this country.  The Court finds this testimony credible.  Moreover, Rev. Arthur testified that he did not know in 1980 how to obtain a birth certificate from California for Arthur-Price given that she had been born at home.  This testimony likewise was credible.

Rev. Arthur testified that instead, he obtained a birth certificate for Arthur-Price

---

[2] This is somewhat inconsistent with Essell's affidavit, in which he stated that he heard on January 13, 1980, from Dwumfoh that Mrs. Arthur had given birth and visited that day.  But this is a minor detail.  Essell's affidavit corroborates the key point of Mrs. Arthur's testimony, which is that she gave birth to Arthur-Price at home in Oakland.

from Ghana on September 4, 1980.  He explained that he did so because he needed a birth certificate for her to prove her parentage, and it was easiest to obtain one from Ghana.  He said that he asked a relative or friend to obtain the birth certificate on his behalf because he was not living in Ghana at the time.  Rev. Arthur also testified that he did not know at the time that it was possible to obtain a delayed birth certificate from California.

Mrs. Arthur, Armstrong, and Dr. Sampah all testified that there was a baptism at First AME Church for Arthur-Price when she was an infant.  Armstrong testified that she did not attend the baptism but instead learned from Eady that it had taken place.  Dr. Sampah testified that he attended the baptism and that it took place about three months after Arthur-Price's birth.  Mrs. Arthur recalled the baptism occurring slightly sooner, about two to three weeks after Arthur-Price's birth.  Both Armstrong and Mrs. Arthur testified that the pastor who baptized Arthur-Price was Rev. George Reid.

The record contains a certificate of baptism stating that Arthur-Price was baptized on February 17, 1980, at First AME Church in Oakland, California by George R. Reid.  Pl.'s Ex. A.  The record also contains another baptismal certificate that has all the same information, except it reports that Arthur-Price's baptism was on September 7, 1980.  Def.'s Ex. A at 90.  Mrs. Arthur credibly explained that she lost Arthur-Price's original baptismal certificate, which reported the February date, and that when she was sent a replacement, it bore the incorrect September date.  She testified that she later found the first baptismal certificate.

In September 1980, after Arthur-Price's baptism, Rev. Arthur joined Mrs. Arthur and Arthur-Price in Oakland because he had been accepted to Patten College, which

7

was located there.  Rev. Arthur used his letter of acceptance from Patten to obtain an F-1 student visa to come to the United States.  He testified that when he arrived, Mrs. Arthur and Arthur-Price were ill.  Rev. Arthur said he took them to Oakland Children's Hospital, where Arthur-Price was provided a patient identification card around October or November 1980.  The identification card, which was admitted in evidence, lists Arthur-Price's birthdate as January 12, 1980.  Pl.'s Ex. C.  As noted above, the hospital has not retained any medical records for the time period when Arthur-Price was born, which at this point is over 40 years ago.

Mrs. Arthur testified that Arthur-Price's first immunizations were administered in Oakland.  The record contains evidence of two sets of vaccination records.  Both vaccination records include stamps from Kaiser Medical Office in Pleasanton, California as the "Doctor Office or Clinic" for a number of vaccinations given across a range of dates from 1983 to 1996.  Def.'s Ex. A at 9–10, 22–23.  (Pleasanton is in the East Bay area of Northern California, around thirty miles from Oakland.)  These dates include periods where Rev. and Mrs. Arthur reported that they were living outside of California. The only difference between the two sets of records is that one vaccination record includes two stamps from "Oakland Medical Center Kaiser Permanente" in Oakland, California for HIB vaccinations on March 10, 1980 and May 15, 1980.  *Id.* at 23.  On the other vaccination record, the HIB vaccine section is blank.  *Id.* at 10.

When asked about the inconsistent records, Rev. Arthur explained that Kaiser created the two records and completed the HIB vaccination section in the second record when evidence of the vaccinations was later discovered.  And according to Rev. Arthur, most of the vaccinations report Kaiser's Pleasanton office because when he joined the

Navy, his recruiter asked him to reach out to Kaiser's Pleasanton office to compile all the vaccination records. Again, the record includes no underlying hospital or clinic records regarding Arthur-Price's vaccinations.

## C.   Departure and re-entry to the United States

Rev. Arthur, Mrs. Arthur, and Arthur-Price lived together for two and one-half years in Oakland while Rev. Arthur attended Patten College. At some point during that time, they learned that Mrs. Arthur could not obtain an F-2 student dependent visa unless she first returned to Ghana to process the application. She therefore decided to leave the United States in 1981, accompanied by Arthur-Price, who was just one year old at the time. Mrs. Arthur testified that, as with her arrival, Dwumfoh (her older brother) organized the return trip. Neither she nor Arthur-Price carried passports.

Kolb testified that in this period, the U.S. government did not examine passports or visas when individuals departed the United States. Instead, airlines were responsible for collecting the passengers' I-94 forms and reviewing that they had the correct documentation. But Kolb testified that this requirement was not always followed by the airlines.

Mrs. Arthur testified that after she and Arthur-Price arrived in Ghana, she used a Ghanaian birth certificate for Arthur-Price when applying for a visa for her to return to the United States. She credibly explained that she believed she needed the Ghanaian birth certificate to obtain the visa because she did not have any documentation of Arthur-Price's birth in the United States. Mrs. Arthur's first F-2 visa application was rejected, so Rev. Arthur traveled to Ghana to assist her. Mrs. Arthur was ultimately able to obtain an F-2 visa for herself and Arthur-Price, which they used to return to the

United States in September 1982.

The record contains a replacement I-94 showing that Mrs. Arthur was admitted in Los Angeles on September 5, 1982 on an F-2 visa. Def.'s Ex. J at 68. Mrs. Arthur's visa shows that it was issued July 28, 1982 and permitted multiple entries until October 28, 1982, when the visa expired. *Id.* at 67. Kolb explained that the term "multiple entries" means that Mrs. Arthur was allowed to travel wherever she wanted during this time. Her visa included a notation that she was Rev. Arthur's spouse and that her visa "includes one (1) child, M. ARTHUR." *Id.* The visa was later corrected so that it would not expire during the duration of her F-2 status.

**D.    Applications for immigration benefits**

The record contains a variety of applications for U.S. immigration benefits filed by Rev. and Mrs. Arthur for themselves and on Arthur-Price's behalf. In 1984, Mrs. Arthur applied for status as a permanent resident and completed the accompanying biographic information form. The biographic form states that she was employed as a teacher in Swedru, Ghana from September 1979 until July 1980, which includes the period that she testified she was living in Oakland. Def.'s Ex. B at 4. Mrs. Arthur explained that she reported that her employment continued until July 1980 even though she had been living in the United States because her Ghanaian employer had continued to pay her. She also listed her residence on the form as an address in Lagos, Nigeria from October 1977 until September 1980 and then an address in Oakland, California beginning in September 1980 until May 1982. This presents another conflict with her testimony that she came to the U.S. in 1979 and gave birth to Arthur-Price in Oakland in January 1980. Rev. Arthur explained that Mrs. Arthur was not actually living at those addresses at the

time and that she just used the addresses where he was living. Mrs. Arthur's reported addresses are consistent with the places of residence that Rev. Arthur listed on his 1986 application for permanent resident status.

Both Rev. and Mrs. Arthur's applications for permanent resident status listed Arthur-Price's place of birth as Accra, Ghana and her date of birth as July 3, 1980. In 1984, Rev. Arthur also filed an application for permanent resident status on behalf of Arthur-Price (who would have been around four years old at the time). This application also stated that Arthur-Price was born on July 3, 1980 in Accra, Ghana, and a Ghanaian birth certificate supporting that fact dated May 7, 1981 was attached to the application.

In 1992, Rev. Arthur applied for naturalization. His application again listed Arthur-Price's birthplace as Ghana but now listed her date of birth as January 12, 1980. Similarly, Rev. Arthur filed a Form N-600 citizenship application on Arthur-Price's behalf in 1997, stating that she was born on January 12, 1980, in Ghana. A Ghanaian birth certificate for Arthur-Price dated September 4, 1980 was attached; it stated that she was born in Twiekrom, Ghana on January 12, 1980. This application was denied in 2000 because Arthur-Price had aged out of eligibility before it was adjudicated.

Rev. Arthur then filed a Form I-130 petition for alien relative on Arthur-Price's behalf in 2001. This application likewise stated that she was born in Accra, Ghana on January 12, 1980. Attached to the application was yet another Ghanaian birth certificate—this one dated November 2, 1998—stating that Arthur-Price was born in a hospital in Accra, Ghana on January 12, 1980. The I-130 application was approved on May 1, 2002.

In total, Rev. Arthur guessed that he may have obtained five Ghanaian birth

certificates for Arthur-Price.[3]  He testified that for each one, he asked relatives or friends to obtain the certificate and did not interact directly with the Ghanaian authorities.

The final immigration application filed by Arthur-Price's parents was Mrs. Arthur's naturalization application.  It was filed in 2008 and listed Arthur-Price's country of birth as U.S.A. and date of birth as January 12, 1980.

For all the applications for immigration benefits that Rev. and Mrs. Arthur filed, they were represented by attorneys.

In August 2018, Rev. Arthur petitioned the High Court in Ghana for cancellation of all Arthur-Price's Ghanaian birth certificates.  Rev. Arthur testified that he did this because he wanted to set the record straight; he wanted to let the Ghanaian authorities know that Arthur-Price was not actually born in Ghana.  He also testified that he filed this petition after seeking legal guidance when, as described below, Arthur-Price's U.S. passport applications were denied.  The High Court granted Rev. Arthur's motion, and Arthur-Price's Ghanaian birth certificates were revoked.  Arthur-Price testified credibly that she did not find out about any of this from her father until after the fact.

## E.    Arthur-Price's passport applications

Arthur-Price credibly testified that she had grown up believing that she is a U.S. citizen because her parents had always told her she was born in the United States.  She also credible testified that she was unaware that her father filed a I-130 petition on her behalf in 2001.  Because she believed she was a U.S. citizen, Arthur-Price has applied for a U.S. passport four times.  She abandoned her first application, filed May 13, 2006, and second application, filed March 7, 2008, after requests for further information from

---

[3] There are four Ghanaian birth certificates in the record.

the Chicago Passport Agency.

Arthur-Price's second passport application included a California birth certificate issued on June 17, 2002, stating that she was born in Oakland, California on January 12, 1980. She had discovered in 2002, when she was twenty-two years old, that she did not have a U.S. birth certificate, so she applied for a delayed California birth certificate. The "evidence submitted" section of the birth certificate lists Arthur-Price's September 1980 baptismal certificate and her Highland Park, Illinois high school records as supporting evidence. Def.'s Ex. A at 8. Rev. Arthur (who stated that he assisted in applying for the delayed birth certificate) testified that there were more supporting documents submitted than those listed. Arthur-Price's application also included a letter from California's Department of Health Services, the agency that issued her birth certificate, which stated that the letter should be used "as the *final supporting documentation* as to the validity of [Arthur-Price]'s delayed certificate of birth." *Id.* at 11. The letter stated that the "department does an in-depth follow-up on original documentation submitted by a person in support of a request for a delayed certificate of birth." *Id.* "Several types of permissible documentation supported [Arthur-Price]'s request for a delayed certificate, including immunization records from Texas, as well as an original baptismal certificate," however, "all of the original documentation that supported [Arthur-Price's] request for [her] certificate of birth has been purged." *Id.* at 11–12.

Arthur-Price filed a third passport application on June 19, 2013. It was denied on April 2, 2014 for failing to sufficiently establish her birth in the United States. With her fourth application, filed on June 16, 2017, she attached affidavits from her parents, Dr.

13

Sampah, and Essell, and sworn letters from Eady and Armstrong. She also submitted a bible inscription, which Mrs. Arthur testified was presented to her by Maxine Johnson. The inscription is dated March 10, 1980, and states: "To celebrate the birth of your lovely baby girl, I would like to present you this bible. Many blessings to you and the new arrival. Your neighbor and friend, Maxine Johnson." Pl.'s Ex. B. Arthur-Price's fourth application was denied on March 1, 2018.

After Arthur-Price's third passport application was filed in 2013, her case was referred to Diplomatic Security for possible fraud. Agent Knolle was the agent assigned to her case. He testified that in his first interview with Arthur-Price, she said she was unaware that she had an alien ("A") number. Arthur-Price testified credibly that it was from Knolle that she first learned that various Ghanaian birth certificates had been obtained on her behalf. She called her father, and he told her that mistakes had been made. Knolle testified that in a telephone interview, Rev. Arthur explained to him that Mrs. Arthur travelled to the United States with her brother, Dwumfoh, in 1979 without knowing that she was pregnant. When he found out she was pregnant, Rev. Arthur said, he applied for a visa to join them in California. When he did not get an answer from Dwumfoh regarding how Mrs. Arthur came to the United States, he thought she may have entered illegally, so he wanted her and Arthur-Price to go back to Ghana so that they could legally apply to come to the United States.

Following a second interview with Arthur-Price, Knolle concluded that she was born in Ghana. He placed her under arrest for passport fraud and making false statements. When the Court asked what false statement Arthur-Price had made, Knolle testified that he believed *all* her answers were false. Knolle stated that he could not find

*any* history of the family living in California from commercial database records, so he believed that she never actually had lived in California. The U.S. Attorney's Office sensibly declined prosecution of Arthur-Price, as there was and is no evidence that she made any knowing misstatements.

The Court does not find Knolle's testimony persuasive. If nothing else, there is ample evidence supporting the fact that the Arthur family lived in California for at least some time while Rev. Arthur was attending Patten College in Oakland. This includes a letter from Patten College (now Patten University) verifying his enrollment and housing from 1980-1982. The Court does not find persuasive Knolle's view that all the corroborating evidence, including the bible inscription and medical records, was fabricated by Arthur-Price and her family.

## Discussion

Arthur-Price seeks a judgment declaring her to be a national of the United States under 8 U.S.C. § 1503 because she was born in the United States. Section 1503 states:

> If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28 against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of, or in connection with any removal proceeding under the provisions of this chapter or any other act, or (2) is in issue in any such removal proceeding. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is conferred upon those courts.

8 U.S.C. § 1503(a).  The Court determines Arthur-Price's status as a U.S. citizen *de novo*.  *Mathin v. Kerry*, 782 F.3d 804, 805 (7th Cir. 2015), *as amended on denial of reh'g* (July 7, 2015).  Arthur-Price "has the burden of demonstrating [her] citizenship by a preponderance of the evidence."  *Id.* at 807; *see* 22 C.F.R. § 51.40.[4]

Although the "primary evidence of birth in the United States" is a birth certificate filed "within one year of the date of birth," "secondary evidence" can also be used to establish that a person was born in the United States.  22 C.F.R. § 51.42.  "Such evidence may include, but is not limited to, 'hospital birth certificates, baptismal certificates, medical and school records, certificates of circumcision, other documentary evidence created shortly after birth but generally not more than 5 years after birth, and/or affidavits of persons having personal knowledge of the facts of the birth.'"  *Mathin*, 782 F.3d at 807 (quoting *id.*).

Arthur-Price faces an uphill battle, mainly because two of her key witnesses—her parents—have repeatedly stated in the past that she was born in Ghana and have given inconsistent accounts regarding the events during the relevant period.  Though both parents testified under oath at the bench trial that Arthur-Price was, in fact, born in

---

[4] Arthur-Price contends that she only needs to make a prima facie case by a preponderance of the evidence, at which point the government must respond with "clear, unequivocal, and convincing evidence which does not leave the issue in doubt." *Perez v. Brownell*, 356 U.S. 44, 47 n.2 (1958), *overruled on other grounds by Afroyim v. Rusk*, 387 U.S. 253 (1967).  But *Perez* involved an "act of expatriation," not a passport denial.  *Id.*  Although the D.C. Circuit has suggested that the burden-shifting test from *Perez* applies to passport denials, *L. Xia v. Tillerson*, 865 F.3d 643, 656 (D.C. Cir. 2017), the Seventh Circuit has not applied this test to cases involving passport denials.  *See Mathin*, 782 F.3d at 807.  In any event, because the Court concludes that it is more likely than not that Arthur-Price was born in the United States, the Court need not determine whether a lower burden of persuasion should apply.

16

Oakland, California, it is fair to say that they had a lot of explaining to do given their past statements. There is a temptation to take the simple route and conclude that their past stories represent the truth—which would result in the denial of Arthur-Price's claim in this case. But after careful consideration of the evidence, the Court finds that the Arthurs' testimony that Arthur-Price was born in the U.S. is both corroborated and credible. The Court concludes that Arthur-Price has met her burden to establish by a preponderance of the evidence that she was born in Oakland, California.

The key issues involving the trial testimony of Arthur-Price's parents include the absence of any record of Mrs. Arthur's entry into the U.S. in 1979; the absence of a U.S. birth certificate issued contemporaneously with Arthur-Price's birth; the issuance of several Ghanaian birth certificates for Arthur-Price; and the parents' prior statements and applications to U.S. authorities representing that Arthur-Price had been born in Ghana. The Court has carefully considered the evidence explaining these points, as well as the affirmative evidence offered by Arthur-Price supporting her claim and corroborating her parents' trial testimony that she was, in fact, born in the United States.

When Mrs. Arthur came to this country in 1979, she says, , she was accompanied by her brother. She said she did not carry any documentation herself and that her brother, Paul Dwumfoh, handled all the arrangements. The Court finds it entirely plausible that Dwomfoh had and handled the travel documents that permitted Mrs. Arthur to enter the U.S. at that time.

The real question, however, is not how or exactly when Mrs. Arthur arrived in the U.S.; it's where Arthur-Price was born. There is no *contemporaneous* U.S. birth certificate documenting her birth in Oakland. By contrast, several Ghanaian birth

certificates were issued for Arthur-Price, at Rev. Arthur's behest. And, as indicated, the Arthurs have previously represented on numerous occasions that Arthur-Price was born in Ghana. These include the representations made to obtain the Ghanaian birth certificates and those made in connection with several applications for immigration-related benefits in this country. The Arthurs' testimony is that all of these previous representations, a number of which they made under oath, were all untrue.

It's certainly possible that the Arthurs could be lying now in order to secure citizenship for their daughter. The Court finds, however, that their current testimony is true and that their previous representations were not. The Court finds credible the Arthurs' explanation for the earlier falsehoods. First are the Ghanaian birth certificates. Simplifying Rev. Arthur's explanation a bit, he said that because Arthur-Price was born at home and they did not have any documentary evidence of her birth, the only way he knew to obtain a birth certificate was from Ghana. The Court finds credible the testimony that Arthur-Price's parents did not know at the time of her birth how to go about obtaining a birth certificate from California given her birth at home rather than at a hospital. The Court also finds credible that they were not aware at the time of U.S. birthright citizenship. Likewise credible was the testimony that they obtained the Ghanaian birth certificates because they needed or wanted documentation of Arthur-Price's birth, and this was the only way they knew at the time to obtain that.

But once the Arthurs had gone the route of—for want of a better word—"anchoring" their daughter's birth in Ghana, they were basically stuck with that going forward, or at least believed themselves to be stuck with it. This is, in the Court's view, the best explanation for their representations to U.S. authorities that Arthur-Price had

been born in Ghana:  it's a manifestation of the Court's allusion to the "tangled web" woven once one practices to deceive.

The Court's finding regarding the credibility of the Arthurs' testimony that Arthur-Price was born in the United States is based on its consideration of all the evidence, including not only their demeanor but also other evidence that corroborates their testimony about Arthur-Price's birthplace.  First, there is the testimony of their friends who, despite some inconsistencies, uniformly described that they knew Mrs. Arthur when she was pregnant and when she had a young child in 1980 in Oakland.  The bible inscription that was presented to Mrs. Arthur from Johnson, dated March 10, 1980, provides evidence that Johnson, who lived in Oakland, knew Mrs. Arthur and knew she had recently given birth.  This supports the fact that Mrs. Arthur was in the United States in early 1980 and gave birth during that time.  The Court finds that the bible inscription is authentic and was created on or about the date it bears.

The government contends that the bible inscription must be a forgery because it is implausible that Mrs. Arthur could have been in the United States at that time.  The Court is not persuaded that Mrs. Arthur's entry into the United States is so unlikely. Although her entry may well have been improper, Kolb agreed that there were numerous ways a person could enter the United States improperly and that security measures were not as strict in that time as they are today.  And as the Court has stated, it is plausible that Mrs. Arthur's brother had, and presented, her travel documentation at that time.

Aside from the inscription, Arthur-Price's vaccination records also corroborate the contention that she was born in the United States.  The records identify two HIB

19

vaccinations given to Arthur-Price in Oakland, California on March 10, 1980, and May 15, 1980. This again shows, at a minimum, that Arthur-Price was in Oakland around the time of her birth, and it makes it more likely that she was born in the United States as she contends. The Court acknowledges that these documents do not appear to be contemporaneous records of the immunizations, but the Court is persuaded that they are authentic records prepared by the Kaiser Permanente system and that they accurately document actual immunizations administered to Arthur-Price. Although there is another version of Arthur-Price's vaccination records, both appear to have been proper and authentic records of Kaiser Permanente (among other things, both have stamped addresses). Rev. Arthur's explanation that these records were not contemporary, but rather compiled after the fact at the behest of his insurer, arguably diminishes their value somewhat. But the Court sees no basis to find that the records are inauthentic or that the insurer compiled them improperly or fraudulently.

In addition, Arthur-Price's delayed birth certificate issued by the State of California supports her claim that she was born in Oakland. *See Mathin*, 782 F.3d at 809 ("The district court recognized that the issuance of the [delayed birth] certificate by Illinois was evidence favorable to Mathin's claim of citizenship."). The government contends that under *Mathin*, "in assessing the weight to be given to the delayed certificate of birth," the Court should only consider the two underlying documents referenced on the birth certificate, which were Arthur-Price's baptism certificate and Illinois high school records. *Id.* In *Mathin*, however, the Seventh Circuit noted that the Illinois birth certificate "was issued based on" the two underlying documents it referenced. *Id.* In this case, by contrast, a letter from California's Department of Health

Services, which issued the birth certificate, confirmed that it considered "several types of permissible documentation," including documents that were not referenced on the birth certificate itself, namely, her immunization records. Def.'s Ex. A at 12. Thus, in evaluating the weight of Arthur-Price's delayed birth certificate, the Court need not disregard the certificate because of the problems the government identifies with the baptism certificate and the Illinois high school records.

In addition, the Court is not persuaded that the baptismal certificate is as unreliable as the government contends. Although there are two versions of the certificate in the record with inconsistent dates, Mrs. Arthur credibly explained that when she requested a replacement baptismal certificate, it was sent with the wrong date. Even Agent Knolle testified that these kinds of clerical errors are common when certificates are reissued. Although he said this in the context of foreign birth certificates, the same logic seems applicable to Arthur-Price's baptismal certificate. This certificate likewise provides some corroboration for the Arthurs' testimony regarding Arthur-Price's place of birth.

Finally, having found credible Rev. and Mrs. Arthur's explanation for why they obtained fabricated Ghanaian birth certificates, the Court places little weight on those birth certificates' existence. The birth certificates themselves are inconsistent, varying not just with respect to Arthur-Price's birthdate, but also regarding the city in Ghana in which she was purportedly born and whether she was born in a hospital. This is consistent with Rev. Arthur's testimony that he obtained the birth certificates through a relative or friend and did not have much control over the information provided to Ghanaian authorities. The record does not contain any underlying evidence of Arthur-

Price's birth in Ghana, such as hospital records. The government contends that "a contemporaneous foreign birth record creates a presumption of alienage." Def.'s Pre-trial Br. at 3 (citing *Rivera v. Albright*, No. 99 C 328, 2000 WL 1514075, at *3 (N.D. Ill. Oct. 11, 2000)). But even if so, the Court finds that this presumption has been overcome by Rev. and Mrs. Arthur's testimony and the corroborating evidence. Moreover, Arthur-Price's Ghanaian birth certificates have since been annulled by the High Court of Ghana.

In sum, the Court concludes that it is more likely than not that Arthur-Price was born in Oakland, California. Thus, the Court grants her request under 8 U.S.C. § 1503(a) for a declaratory judgment that she is a U.S. citizen by virtue of her birth in the United States.

### Conclusion

For the reasons stated above, the Court directs the Clerk to enter judgment in favor of plaintiff and against the defendant declaring that Maameamba Arthur-Price is a U.S. citizen and national by virtue of her birth in the United States.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 7, 2023